IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Civil Action No. 10-cv-02810-PAB-BNB

OILMAN INTERNATIONAL, FZCO,

Plaintiff,

v.

MARVIN BRUCE NEER d/b/a TREE MACHINES, and
JESUSA S. NEER a/k/a JESUSA S. BARTOLOME,

Defendants.
_____

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**
_____

This matter arises on the following motions:

1. **Plaintiff's Motion for Partial Summary Judgment** [Doc. #64, filed 08/16/2011]

(the "Plaintiff's Motion"); and

2. **Defendant Jesusa Neer's Motion for Patial** [sic] **Summary Judgment** [Doc. #77,

filed 10/14/2011] ("Mrs Neer's Motion).

I respectfully RECOMMEND that both Motions be DENIED.

**I. STANDARD OF REVIEW**

In ruling on a motion for summary judgment, the facts must be viewed in the light most favorable to the party opposing the motion and that party must be afforded the benefit of all reasonable inferences to be drawn from the evidence. Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970). Summary judgment shall be rendered "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A genuine issue of material fact exists "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating by reference to portions of pleadings, discovery and disclosure materials on file, and any affidavits, the absence of genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." Trainor v. Apollo Metal Specialties, Inc., 318 F.3d 976, 979 (10th Cir. 2002).

The party opposing the motion is then required to go beyond the pleadings and designate evidence of specific facts showing that there is a genuine issue for trial. Celotex, 477 U.S. at 324. Only admissible evidence may be considered when ruling on a motion for summary judgment. World of Sleep, Inc. v. La-Z-Boy Chair Co., 756 F.2d 1467, 1474 (10th Cir. 1985).

## II.  UNDISPUTED MATERIAL FACTS[1]

1. Southeast Asia Machinery is a fully registered Indonesian company that, among other things, acts as an agent in moving oil, gas, and marine equipment from one company to another. *Motion*, Ex. 1, 13:3-16.

2. Mike Williams is the business development manager for Southeast Asia Machinery and acts as a sales coordinator for the end buyer of heavy equipment. Id. at Ex. 2, 12:25-14:10.

---

[1] Mr. Neer did not respond to the Plaintiff's Motion. Mrs. Neer does not dispute any material facts that pertain solely to Mr. Neer.

3. Oilman International, FZCO ("Oilman International") is a manufacturer of oil and gas drilling rigs, predominantly land and other offshore-based rigs. Id. at Ex. 3, 15:13-15.

4. Peter McCallum is the CEO/manager of Oilman International. Id. at Ex. 4, 16:13-14.

5. In November of 2008, Mr. McCallum asked Mr. Williams to obtain two new 3512 industrial engines set up for oil and gas drilling. Id. at Ex. 5, 17:21- 25.

6. Mr. Williams contacted his Caterpillar distributors in Canada and the United States, but he was unable to locate a supplier for the engines. Id. at Ex. 6, 18:3-11; 21:8-10.

7. Mr. Williams was referred by one of his contacts to Tree Machines. On November 26, 2008, Mr. Williams sent an e-mail to treemachines1@msn.com stating that he was looking for two new 3512 engines to drive mud pumps and that "these engines MUST HAVE MECHANICAL GOVERNORS, as the contract with Shell will not allow for electronic governors. Full details on the engine required are attached." Id. at Ex. 7, 21:11 – 23:17; Ex. 8.

8. The e-mail contained a four page attachment that outlined all of the required specifications for a 3512 DITA Land Mechanical Engine rated 1,250 horsepower at 1,200RPM. Id. at Ex. 9, 23:15 – 24:5; Ex. 8.

9. On November 28, 2008, Marvin Neer responded to Mr. Williams' inquiry with a quotation indicating that he had two industrial engines with mechanical governors rated at 1250 horsepower at 1200 RPM "with world wide cat warranty." Id. at Ex. 10, 33:21 – 34:2. Mr. Neer further stated "We have reached a price of $259,900.00 EACH, FOB USA, which includes the following: . . . ." Id. at Ex. 11.

10. Mr. Neer's reference to "world wide cat warranty" was indicative that the engines were new. Id. at Ex. 12, 35:15 – 36:6.

11. Also on November 28, 2008, Mr. Williams advised Mr. Neer that the client would take the two engines quoted by Mr. Neer and that he now needed to know "the closest airport, exact weights, along with pictures . . . and serial numbers." Id. at Ex. 13, 43:11 – 44:7; Ex. 14.

12. In a subsequent telephone conversation with Mr. Williams, Mr. Neer indicated that he was in direct contact with Caterpillar; he was one of a few who was allowed to purchase direct from Caterpillar; the two engines were on the production line at Caterpillar; and that upon completion they would be released. Id. at Ex. 15, 46:6-14.

13. Mr. Neer represented to Mr. Williams that the engines would be released from the Caterpillar manufacturing process on December 7, 2008. Id. at Ex. 16, 59:11 – 60:4.

14. On November 29, 2008, Mr. Neer sent to Mr. Williams a follow-up e-mail stating: "the engines look like this," attaching a graphic file "3512 IND 1.jpg;" that depicted an industrial engine. Id. at Ex. 17, 47:21 – 49:8.

15. On November 30, 2009, Mr. Neer wrote an e-mail to Mr. Williams advising him in relevant part: "These engines are in great demand and will need a 20% deposit very, very soon to hold these engines." The e-mail also provided Mr. Williams with Mr. Neer's bank account information. Id. at Ex. 18, 45:17-20; Ex. 19.

16. Doug Shupe operates a heavy marine equipment brokerage firm named MyMarineTracker, LLC, incorporated in the state of Wisconsin. Id. at Ex. 20, 5:6-11.

17. Sometime in late November, Mr. Neer telephoned Doug Shupe and asked him: "Hey, Doug, you got any Caterpillar 3512 engines?" to which Mr. Shupe replied: "Sure, I know a pair that I have been trying to sell that are out on the West Coast." Id. at Ex. 21, 19:6-18.

18. Mr. Neer did not specify to Mr. Shupe whether he was looking for marine

or land based engines. Id. at Ex. 22, 20:1-14.

19. Mr. Shupe forwarded to Mr. Neer an e-mail that Mr. Shupe had received from his contacts at the Finning of Canada Caterpillar distributorship in Richmond, British Columbia ("Finning"). Id. at Ex. 23, 22:12-18.

20. The e-mail contained the serial numbers, the Caterpillar Bill of Materials with the Caterpillar part numbers, and three photographs of the two engines. Id. at Ex. 24, 22:19 – 24:9; Ex. 25.

21. The e-mail related to "used" engines and not "new" engines, id. at Ex. 26, 24:18-24, and contained a parts list for a 3512 DITA marine propulsion engine. Id. at Ex. 27, 25:7-24; 30:18 – 32:10. In addition, the e-mail advised that the engines "came in at 900rpm but we can re rate to 1200rpm." Id. at Ex. 25.

22. The three photographs attached to the email of December 1, 2008, depict Caterpillar 3512 marine engines. Id. at Ex. 28, 50:25 – 51:7; Ex. 29, pp. 7-9.

23. Mr. Neer did not forward to Mr. Williams the e-mail from Mr. Shupe that included the three photographs. Mr. Williams did not see the e-mail until his deposition. Id. at Ex. 30, 49:24 – 50:19.

24. On December 2, 2008, Mr. Neer sent an e-mail message to Mr. Williams stating that he had another pair of 3512 DITA engines available and further stated that "[t]hey are currently rated 900 h/p at 1200 rpm, we can have cat re-rate the h/p with bigger injectors and adjust the settings on the fuel injection pump to bring it up to your specifications of 1250 h/p @ 1200 rpm." Id. at Ex. 31.

25. Mr. Williams had no interest in pursuing the other pair of engines because he wanted to procure the new engines that Mr. Neer had already presented to him. The alternate engines only had 900 horsepower, and Mr. Williams needed engines with 1200 horsepower. Id. at Ex. 32, 55:11 – 56:8. Nonetheless, Mr. Williams indicated that he passed along all the details regarding both options now available. Id. at Ex. 31.

26. Mr. Neer's reference to having located another pair of 3512 engines rated at 900 horsepower that could be re-rated to 1,200 horsepower roughly matches Mr. Shupe's description of the two marine engines that he had located. Id. at Ex. 25; Ex. 31.

27. On December 2, 2008, Mr. Williams advised Mr. Neer that "the client is interested in the purchase of the two engines that will be completed 7th December," and further requested an official quotation. Id. at Ex. 33.

28. Mr. Neer prepared the original quotation. Id. at Ex. 34, 72:2-8. Mr. Williams in turn finalized the quotation and, on or about December 4, 2008, Mr. Williams advised Mr. Neer by e-mail that "the official quotation/proforma as [sic] been sent to Oilman International . . . ." Id.; Ex. 35.

29. The official quotation/proforma was also forwarded to Mr. Neer as an attachment to the December 4, 2008 e-mail. Id. at Ex. 36, 68:17-21; Ex. 35.

30. Mr. Williams wrote to Mr. Neer that he could soon expect his 20% deposit, and that he would soon need the serial numbers for shipping purposes and the actual weight of the units without radiators. Id. at Ex. 35.

31. The Official Quote/Proforma describes Caterpillar 3512 industrial/mechanical engines identical to those described in the four page attachment to Mr. Williams' email of November 6, 2008. Id. at Ex. 37, 69:10-15.

32. On December 5, 2008, Mr. Neer requested from Mr. Shupe that the horsepower of the two engines be adjusted from 900 horsepower to 1200 horsepower. Id. at Ex. 38, 32:11-33:9. Mr. Shupe confirmed with Mr. Neer that the adjustment could be made at Finning. Id. at Ex. 39.

33. The total due for both engines was listed as $559,800.00 USD. Id. at Ex. 35. Mr. Neer produced a revised quotation on December 10, 2008, to reflect the 20% due in the amount of $111,960.00. Id. at Ex. 40, 82:9-25; Ex. 41.

34. On December 18, 2008, Mr. Williams advised Mr. Neer that Oilman International had made the 20% deposit. Id. at Ex. 42, 110:17 – 111:6; Ex. 43.

35. On December 19, 2008, Mr. Williams wrote to Mr. Neer that they needed the serial numbers for the two engines. Id. at Ex. 44, 111:12 – 112:6; Ex. 45.

36. Bank records from Wells Fargo indicate that on December 22, 2008, Oilman International deposited $111,930.00 into Mr. Neer's bank account. Id. at Ex. 46, p.3.

37. On December 22, 2008, Mr. Neer acknowledged receipt of the 20% deposit, but further indicated that he did not want to provide Mr. Williams with the full serial numbers before payment in full. Id. at Ex. 47, 116:15 – 117:3.

38. On December 23, 2008, Mr. Williams reminded Mr. Neer that Oilman International needed the serial numbers to make arrangement for shipping. Id. at Ex. 48, 117:22 – 118:5; Ex. 49.

39. Mr. Neer did not provide the serial numbers for the new engines that Oilman International was purchasing from Mr. Neer.  Id. at Ex. 50, 118:6-21.

40. On or about January 9, 2009, Oilman International transferred the remaining balance of $447,793.66 to Mr. Neer's bank account.  Id. at Ex. 51, p.3.  On January 9, 2009, Mr. Neer acknowledged receipt of the payment and indicated to Mr. Williams that he would now send Mr. Williams his commission on the transaction.  Id. at Ex. 52, 124:1-8; Ex. 53.

41. On January 11, 2009, Mr. Neer sent more explicit confirmation that he was "in receipt of full payment for the two 3512 engines."  Id. at Ex. 54, 125:1-21; Ex. 55.

42. As of January 11, 2009, Oilman International had paid the entire contract price to Mr. Neer but Mr. Williams had not received the serial numbers for the engines from Mr. Neer.  Id. at Ex. 56, 126:5-22.

43. On or about January 13, 2009, Mr. Williams sent an e-mail requesting that Mr. Neer provide the shipment address, photographs of the engines, and the engine dimensions.  Mr. Williams stated:

> Points Required:
> : Please advise collection address ASAP for our freight forwarder.
> : Please advise if you can send some photos.
> : We need to know the exact size of the engine and radiator
> together so we can leave the space required on our project.  Please
> see if you can send Cat drawing that is applicable to these engines
> and radiators

Id. at Ex. 57, 129:17 – 130:16; Ex. 58.

44. Mr. Neer sent the January 13, 2009, e-mail to Mr. Shupe, but omitted the request for photos.  Id. at Ex. 59, 49:6-14); Ex. 60.

45. Mr. Shupe obtained the engines' dimensions and weight from Finning and conveyed that information in an e-mail to Mr. Neer on or about January 13, 2009. Id. at Ex. 61, 59:24 – 60:11; Ex. 62.

46. Specifically, the e-mail states:

> I was able to finally talk to Nairn[2] earlier this morning. I have made an offer to him now and he is passing it by the higher ups for approval. He was optimistic that it will fly.
>
> The Cat 3512 marine propulsion engines are 107" long x 81" high x 68" wide each. They weigh 14,411 lbs each without fluids. Allow more for crating/dun age. The skids that they are sitting on may add somewhat to these dimensions. These will probably both fit in a standard 20ft shipping container. . . . If your clients are going to fly these overseas then they will probably just pick them up without a container.
>
> \* \* \*
>
> Nairn said that they can provide some minimalistic warranty on these engines IF they do the dynometer test. This ensures that everything is kosher of course inside the engine and the dyno test assures them of that. There are not any radiators included with these engines as they are marine propulsion engines. The buyer would have to mount a radiator to the cooling system if they want to cool them that way. Nairn also said that they can take them into their paint booth and give them a new coat of Cat yellow paint to make them look real pretty again and like new.

Id. at Ex. 62.

47. Also on or about January 13, 2009, Mr. Neer sent to Mr. Williams the dimensions information he received from Mr. Shupe. He omitted any reference to the fact that the engines that Mr. Shupe had procured were marine propulsion engines and not land based industrial engines. Id. at Ex. 63, 135:22 – 137:5. Mr. Neer did not share any information about a minimal warranty or the absence of radiators with Mr. Williams. Id. at Ex. 64.

---

[2]Nairn Grundy was the representative of Finning. Id. at Ex. 24 23:6-7.

48. Mr. Neer at no time provided Mr. Williams with the exact weights and measurements of the industrial engines that were the subject of the Official Quotation/Proforma. Id. at Ex. 65, 139:12 – 140:12; Ex. 66.

49. On or about January 15, 2009, Mr. Neer informed Mr. Williams that the engines were not at the Caterpillar factory, but instead were now at Finning Canada. Id. at Ex. 67, 145:11-21; Ex. 68. Mr. Neer assured Mr. Williams that he would get the engines to Atlanta for shipping. Id. at Ex. 69, 152:9– 153:17.

50. As of January 15, 2009, Mr. Williams still had not received from Mr. Neer the drawings, dimensions, weights, and serial numbers of the two industrial engines. Id. at Ex. 70, 157:16-23; Ex. 71.

51. On January 15, 2009, Mr. Shupe provided Mr. Neer with the technical data sheet published by Caterpillar for the Model 3512 marine propulsion engine and stated: "Marvin….Please forward to the buyer." Id. at Ex. 72, 83:15 – 85:1; Ex. 73, pp. 3-9.

52. Mr. Neer did not forward either the e-mail or its attachment to Mr. Williams. Id. at Ex. 74, 159:6-24.

53. On or about January 18, 2009, Mr. Neer provided two serial numbers to Mr. Williams. Mr. Williams determined, for the first time, that the engines that Mr. Neer procured were built in 2006, and were not new off the assembly line as of December 7, 2008. Id. at Ex. 75, 163:10 – 165:8; Ex. 76; Ex. 77.

54. On January 20, 2009, Mr. Shupe called Mr. Williams, at Mr. Neer's request, regarding two marine engines. Id. at Ex. 79, 173:16-21.

55. Mr. Williams clarified with Mr. Shupe that Oilman International had not bought 3512 marine engines, but that instead it had bought two brand-new industrial engines. Id. at Ex. 79, 173:22-25.

56. Oilman International was under a contractual obligation to supply two new Caterpillar Land Industrial Engines to its customer by a date certain. Id. at Ex. 81, p. 3, ¶10.

57. As a result of Mr. Neer's inability to deliver two new 3512 Caterpillar Land industrial Engines, Oilman International was unable to supply those engines to its customer by the deadline agreed to with its customer. Id. at ¶11.

58. Oilman International paid liquidated damages of $2,000/day for a total of $60,000.00 USD to its customer when it was unable to place two new Caterpillar Land Industrial Engines into service in a timely manner. Id. at ¶12.

59. On or about August 19, 2008, Mr. Neer established a basic business checking account with Wells Fargo Bank, N.A. for Tree Machines, a sole proprietorship. (The "Wells Fargo Account"). Id. at Ex. 82, p.4-5.

60. On December 22, 2008, and on January 9, 2009, Mr. Neer received a total of $559,723.66 U.S.D. from Oilman International. Id. at Ex. 83, p. 4-5.

61. On January 13, 2009, Mr. Shupe sent Mr. Neer the pro-forma invoice for the two Cat 3512 marine propulsion engines for a total of $280,000.00. Id. at Ex. 84, 54:16 – 59:18; Ex. 85, p.4.

62. On January 13, 2009, Mr. Neer transferred $280,000.00 to My Marine Tracker, LLC, id. at Ex.. 86, p.4, leaving him with $279,723.66 of the plaintiff's money.

63. On December 23, 2008, Mr. Neer obtained a cashier's check for $50,000.00 payable to Mrs. Jesusa Neer. Id. at Ex. 87, p.4; Ex. 88, 41:1-7.

64. On January 11, 2009, Mr. Neer issued a check to Jesusa Neer in the amount of $20,000.00, id. at Ex. 89, p.4, for which Mrs. Neer obtained a cashier's check the following day. Ex. 90, p.4. The $20,000.00 posted on Mr. Neer's account on January 13, 2009. Id. at Ex. 91, p.4.

65. On January 21, 2009, Mr. Neer provided Mrs. Neer with a cashier's check in the amount of $135,000.00. Id. at Ex. 92, p.4; Ex. 93, 47:16-25.

66. Mr. Neer transferred a total of $205,000.00 to Jesusa Neer, and she acknowledges receiving same. Id. at Ex. 94, 61:6-20.

67. Jesusa and Marvin Neer were married in 1995. Id. at Ex. 95, 7:15-16. The Neers obtained a Decree of Dissolution of Marriage in December 2009. Id. at Ex. 96, 16:6-8; Ex. 97.

### III. ANALYSIS

Oilman International seeks summary judgment on the following claims: Claim One for breach of contract against Marvin Neer; Claim Five for fraudulent misrepresentation against Marvin Neer; Claim Six for fraudulent concealment against Marvin Neer; Claim Eight for civil theft against Marvin Neer and Jesusa Neer; Claim Nine for civil conspiracy against Marvin Neer and Jesusa Neer;[3] Claim Ten for fraudulent conveyance against Marvin Neer and Jesusa Neer; and Claim Eleven for imposition of constructive trust and equitable lien against Jesusa Neer. Oilman International also seeks exemplary damages pursuant to Colo. Rev. Stat. § 13-21-102.

---

[3] Oilman International has conceded the civil conspiracy claim. *Plaintiff's Response to Defendant Jesusa Neer's Motion for Partial Summary Judgment* [Doc. #78], p. 9.

Jesusa Neer has moved for summary judgment on the civil theft and civil conspiracy claims against her.

Under Colorado law, "[o]ne seeking to remedy fraudulent inducement of a contract must elect either to rescind the entire contract to restore the conditions existing before the agreement was made, or to affirm the entire contract and recover the difference between the actual value of the benefits received and the value of those benefits if they had been as represented." Trimble v. City and County of Denver, 697 P.2d 716, 723 (Colo. 1985) (overruled by statute on other grounds) (finding that the plaintiff had affirmed the agreement and was restricted to contractual remedies). Upon rescission, a plaintiff may sue in tort for fraud. If the contract is affirmed, the plaintiff must bring a contract claim. Id.; Aaberg v. H.A. Harman Co.,358 P.2d 601, 603 (Colo. 1960).

"A party must rescind a contract within a reasonable time, but what constitutes a reasonable time depends upon the facts of a particular case and must be determined by the trier of fact." Wall v. Foster Petroleum Corp., 791 P.2d 1148, 1151 (Colo. App. 1989). "The choice of remedies belongs to the one defrauded." Trimble, 697 P.2d at 723. "Election is necessary whenever the theories of recovery are inconsistent." Id.

Oilman International has sued under both contract and tort law. However, the record does not contain any evidence to demonstrate whether the plaintiff has elected to affirm the contract or rescind it. The election is important and necessary because it defines the damages to which Oilman International may be entitled. See Town of Alma v Azco Construction, Inc., 10 P.3d 1256, 1264 (Colo. 2000) (discussing the economic loss rule). Accordingly, the Plaintiff's

13

Motion must be denied insofar as it seeks judgment on both the contract and tort claims asserted against Mr. Neer.

Mrs. Neer's liability is asserted jointly with, or is dependant upon, Mr. Neer's liability. Because the claims against Mr. Neer cannot be decided absent evidence of an election, entry of judgment on the claims against Mrs. Neer would be premature. See AF Prop. P'ship v. State of Colo., Dep't of Revenue, 852 P.2d 1267, 1270-71 (Colo. App. 1992).

## IV. CONCLUSION

I respectfully RECOMMEND:

1. Plaintiff's Motion for Partial Summary Judgment [Doc. #64] be DENIED;

2. Defendant Jesusa Neer's Motion for Patial [sic] Summary Judgment [Doc. #77] be DENIED; and

3. Judgment enter in favor of the defendants in connection with the allegation of civil conspiracy against Marvin Neer and Jesusa Neer contained in Claim Nine.

FURTHER, IT IS ORDERED that pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), the parties have 14 days after service of this recommendation to serve and file specific, written objections. A party's failure to serve and file specific, written objections waives *de novo* review of the recommendation by the district judge, Fed. R. Civ. P. 72(b); Thomas v. Arn, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions. In re Key Energy Resources Inc., 230 F.3d 1197, 1199-1200 (10th Cir. 2000). A party's objections to this recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review. United States v. One Parcel of Real Property, 73 F.3d 1057, 1060 (10th Cir. 1996).

Dated December 13, 2011.

BY THE COURT:

s/ Boyd N. Boland
United States Magistrate Judge